UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————

| | | |
|---|---|---|
| FRANCIS BUTRY, CORI FRAUENHOFER, SANDRA TABAR, and JAELYSABEL VILLASANTE, individually and on behalf of all others similarly situated, | ) ) ) ) | No. 20-cv-5843 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; TRANSWORLD SYSTEMS, INC., in its own right and as successor to NCO FINANCIAL SYSTEMS, INC.; EGS FINANCIAL CARE INC., formerly known as NCO FINANCIAL SYSTEMS, INC.; and FORSTER & GARBUS LLP, | ) ) ) ) ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT**  **Jury Trial Demanded** |
| Defendants. | ) ) | **FILED VIA ECF** |

———————————————————————————

Plaintiffs Francis Butry, Cori Frauenhofer, Sandra Tabar, and Jaelysabel Villasante (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by the undersigned attorneys, allege as follows for this Class Action Complaint against defendants National Collegiate Student Loan Trust 2005-3, National Collegiate Student Loan Trust 2006-1, National Collegiate Student Loan Trust 2007-1, and National Collegiate Student Loan Trust 2007-3 (together, the "Trust Defendants"); Transworld Systems, Inc. ("Transworld"), in its own right and as successor to NCO Financial Systems, Inc. ("NCO"); EGS Financial Care Inc. ("EGS"), formerly known as NCO Financial Systems, Inc.; and Forster & Garbus LLP ("Forster") (collectively, "Defendants"). These allegations are made on information and belief, and pursuant to the investigation by Plaintiffs' counsel.

## NATURE OF THE CASE

1.      Defendants have engaged in a fraudulent scheme to make false representations to consumers and in court filings in order to obtain payment on debts that they cannot prove they are owed.  Defendants have no idea whether, and how much money, they are owed.  They nevertheless sue consumers, obtain judgments against them, and extract money from them.

2.      The National Collegiate Student Loan Trusts ("National Collegiate")[1] have no employees, and use Transworld to collect debts allegedly owed on student loans.  On behalf of National Collegiate, Transworld causes baseless lawsuits to be filed in state and local courts against consumers like Plaintiffs.  Transworld coordinates with law firms throughout the country to sue consumers on National Collegiate's behalf.

3.      In the past five years more than 38,000 such actions have been filed with the assistance of debt-collection law firms, including Forster.

4.      In September 2017, the Consumer Financial Protection Bureau ("CFPB") penalized National Collegiate and Transworld $21.6 million for prosecuting illegal debt-collection lawsuits.[2]

5.      The CFPB found that National Collegiate and Transworld sued consumers in state courts over purported debts that they couldn't prove were actually owed, or were too old to sue over.

---

[1]  There are at least fifteen National Collegiate Student Loan Trusts, including the four Trust Defendants presently named in this action.  "National Collegiate," as used herein, collectively refers to the larger group.

[2]  Proposed Consent Judgment, *Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Trust et al.*, No. 1:17-cv-01323-UNA (D. Del. Sept. 18, 2017) (Dkt. No. 3-1), *available at* https://files.consumerfinance.gov/f/documents/201709_cfpb_national-collegiate-student-loan-trusts_proposed-consent-judgment.pdf; Consent Order, *In re Transworld Sys., Inc.*, Admin. Proc. No. 2017-CFPB-0018 (Consumer Fin. Prot. Bureau Sept. 18, 2017), *available at* https://files.consumerfinance.gov/f/documents/201709_cfpb_transworld-systems_consent-order.pdf.

6.     National Collegiate insiders have confirmed that National Collegiate sues consumers without documentation proving loan ownership.[3]

7.     Defendants have used a variety of illegal tricks to deceive consumers and state courts into believing that a National Collegiate Trust has a valid legal claim against consumers, when in reality it does not.

8.     For example, Defendants' boilerplate complaints against New Yorkers including Plaintiffs falsely have stated that (1) the consumer being sued "borrowed money from plaintiff [the Trust] or plaintiff's assignor", (2) the Trust is the "original creditor" of the loan at issue in the action, and (3) the Trust is "authorized to proceed with this action."

9.     All of these statements violate the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and New York General Business Law ("GBL") § 349.

10.     No National Collegiate Trust has ever lent any consumer money.  Nor has the entity that purportedly assigns to National Collegiate's Trusts the alleged loans underlying the alleged debts that Defendants sue over.  As Judge Shields of the Eastern District of New York has explained, National Collegiate Trusts never originate student loans; instead they are the ultimate owners of bundles of student loan debt following a byzantine securitization process.  Defendants' "assignor" and "original creditor" lies are unlawful because unsophisticated consumers like

---

[3]  *As Paperwork Goes Missing, Private Student Loan Debts May Be Wiped Away*, N.Y. Times, July 17, 2017, https://nyti.ms/2vvroKs (quoting Donald Uderitz of Vantage Capital Group) ("It's fraud to try to collect on loans that you don't own," Mr. Uderitz said.  "We want no part of that[.]"); *Behind the Lucrative Assembly Line of Student Debt Lawsuits*, N.Y. Times, Nov. 13, 2017, https://nyti.ms/2jlqMpZ (noting Vantage Capital's approval of the CFPB action against National Collegiate).

Plaintiffs might not realize that they are dealing with an entity far removed from the actual loan origination—and thus less likely to possess proof of indebtedness.[4]

11.     None of National Collegiate's Trusts is "authorized to proceed" with actions like the ones that Defendants prosecuted against Plaintiffs.  New York law requires out-of-state entities that regularly file suit in this state's courts to register with its Department of State and pay tax. National Collegiate flouts this law, even as its Trusts file countless state-court lawsuits against New Yorkers like Plaintiffs.[5]

12.     Defendants similarly employ illegal tactics later in the state-court litigation process. National Collegiate and Transworld have engaged in the widespread practice of submitting false or deceptive affidavits to state courts in order to fraudulently obtain default judgments against consumers for unprovable debts.[6]

13.     The CFPB found that the Transworld employees or agents who fill out the affidavits filed on National Collegiate's behalf have falsely attested to personal knowledge of (1) the account records and the consumer's debt, and (2) the chain of assignments establishing entitlement to sue. In fact, they robosign the affidavits without reviewing any such evidence.[7]

14.     More recently, National Collegiate has confirmed these facts.  It has sued Transworld and various other entities involved in collecting debts allegedly owed on Trust-held

---

[4] *Winslow v. Forster & Garbus, LLP*, No. 15-cv-2996 (AYS), 2017 U.S. Dist. LEXIS 205113, at *2 n.1, *27–29 (E.D.N.Y. Dec. 13, 2017).

[5] *Id.* at *29–34.

[6] Defendants take advantage of the fact that, under most states' civil procedure law, including New York's, the public employees who oversee the default-judgment process rely upon the representations and certifications of the attorneys who practice before the court.  Given that tens of thousands of such lawsuits are filed every year, judicial system personnel would be overwhelmed if they had to investigate the validity of every default judgment application.

[7] Proposed Consent Judgment, *supra* note 2, at 3.  Indeed, these affidavits are churned out with such rapidity that they are signed in the absence of a notary, in violation of evidentiary law.  *Id.*

loans, in the Delaware Court of Chancery (the "Delaware Action").  The Delaware Action acknowledges the "submission of false and misleading affidavits in collection cases" against individuals like Plaintiffs, and blames Transworld and its affiliates for this "wrongdoing[] done in the name of the Trusts."[8]

15.     The Delaware Action also admits stunning holes in the chain-of-assignment documentation that National Collegiate's Trusts such that the Trusts cannot prove ownership of individual loans.  Any documentation that might have proved chain of assignment of loans—i.e., a recording of every single time a loan was sold and bought, beginning with the originating bank and ending with a Trust—was not properly "safeguard[ed]," according to the Delaware Action.  In the few instances when a consumer has fought back against a state-court collection action, and the matter has gone before a judge, the suits have been dismissed because proof of chain of assignment could not be produced. [9]

16.     As the CFPB's findings and the Delaware Action reveal, National Collegiate and Transworld's business model depends upon a pattern and practice of abusing the judicial system; they could not collect on their securitized student loan debt in any other way.

17.     Essential to the scheme is the assistance of outside law firms like Forster.  These attorneys, who are sworn officers of the court, forsake their legal and ethical duties to the court by filing pleadings and affidavits that they know to be both deceptive, and insufficient as a matter of civil procedure and evidentiary law.

18.     While the boilerplate complaints and motions that Forster has filed on National Collegiate's behalf purport to be communications from an attorney, in fact they were not

---

[8]  Am. Compl. ¶ 5, *Nat'l Collegiate Master Student Loan Trust I et al. v. U.S. Bank Nat'l Assoc. et al.*, No. 2018-0167 (Del. Ch. June 15, 2018).

[9]  *Id.* ¶¶ 73–78.

meaningfully reviewed by an attorney prior to filing.  Instead, they were created by automated systems and non-attorney support staff.  The CFPB recently confirmed that Forster engages in this misconduct when it sued Forster in the Eastern District of New York for a variety of FDCPA violations.[10]

## JURISDICTION AND VENUE

19.     Defendants conduct business in the State of New York, and Defendants' fraud upon Plaintiffs was coordinated in this District.  Venue is proper in this District.

20.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 & 1337, and under 15 U.S.C. § 1692k(d).

21.     This Court has jurisdiction over the New York state law claims pursuant to 28 U.S.C. § 1367.

22.     This Court also has jurisdiction over all the claims under 28 U.S.C. § 1332(d), the Class Action Fairness Act of 2005 ("CAFA"), in that "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a state different from any defendant."

## PARTIES

### Plaintiffs

23.     Plaintiff Francis Butry resides in Erie County, New York.  Mr. Butry is a consumer as that term is defined by 15 U.S.C. § 1692a(3).  Defendants initiated and maintained at least one action against Mr. Butry alleging claims related to consumer debt.

---

[10]  Compl. ¶¶ 2–3, 33, 35, 41–46, *Consumer Fin. Prot. Bureau v. Forster & Garbus, LLP*, No. 2:19-cv-2928 (E.D.N.Y. May 17, 2019) (Dkt. No. 1), *available at* https://files.consumerfinance.gov/f/documents/cfpb_forster-garbus_complaint_2019-05.pdf.

24.     Plaintiff Cori Frauenhofer resides in Erie County, New York.  Ms. Frauenhofer is a consumer as that term is defined by 15 U.S.C. § 1692a(3).  Defendants initiated and maintained at least one action against Ms. Frauenhofer alleging claims related to consumer debt.

25.     Plaintiff Sandra Tabar resides in Kings County, New York.  Ms. Tabar is a consumer as that term is defined by 15 U.S.C. § 1692a(3).  Defendants initiated and maintained at least one action against Ms. Tabar alleging claims related to consumer debt.

26.     Plaintiff Jaelysabel Villasante resides in Kings County, New York.  Ms. Villasante is a consumer as that term is defined by 15 U.S.C. § 1692a(3).  Defendants initiated and maintained at least one action against Ms. Villasante alleging claims related to consumer debt.

**Defendants**

27.     Defendant National Collegiate Student Loan Trust 2005-3 is a Delaware statutory trust that does business in New York.  Its trustee and agent for service of process is Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19890.  According to U.S. Securities and Exchange Commission filings, National Collegiate Student Loan Trust 2005-3 holds 4,939 loans made to New York consumers, with principal amounts thereupon totaling $58,673,315.[11]

28.     Defendant National Collegiate Student Loan Trust 2006-1 is a Delaware statutory trust that does business in New York.  Its trustee and agent for service of process is Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19890.  According to U.S. Securities and Exchange Commission filings, National Collegiate Student Loan Trust 2006-

---

[11]  *See* Prospectus Supplement, National Collegiate Student Loan Trust 2005-3 (Oct. 10, 2005), https://www.sec.gov/Archives/edgar/data/1338373/000112528205005228/b408670_424b5.txt.

1 holds 4,382 loans made to New York consumers, with principal amounts thereupon totaling $45,558,950.[12]

29.     Defendant National Collegiate Student Loan Trust 2007-1 is a Delaware statutory trust that does business in New York.  Its trustee and agent for service of process is Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19890.  According to U.S. Securities and Exchange Commission filings, National Collegiate Student Loan Trust 2007-1 holds 6,418 loans made to New York consumers, with principal amounts thereupon totaling $68,167,664.[13]

30.     Defendant National Collegiate Student Loan Trust 2007-3 is a Delaware statutory trust that does business in New York.  Its trustee and agent for service of process is Wilmington Trust Company, 1100 N. Market St., Rodney Sq., Wilmington, Delaware 19890.  According to U.S. Securities and Exchange Commission filings, National Collegiate Student Loan Trust 2007-1 holds 4,894 loans made to New York consumers, with principal amounts thereupon totaling $70,351,498.[14]

31.     Defendant Transworld Systems, Inc. is a California corporation that maintains its principal place of business at 500 Virginia Drive, Suite 514, Ft. Washington, Pennsylvania 19034.  Transworld does business in New York and regularly attempts to collect debts alleged to be due to another.  Transworld is, either directly or indirectly, owned by Platinum Equity, LLC.  Until on

---

[12] *See* Prospectus Supplement, National Collegiate Student Loan Trust 2006-1 (Mar. 7, 2006), https://www.sec.gov/Archives/edgar/data/1352760/000095011606000714/b412004_424b5.txt.

[13] *See* Prospectus Supplement, National Collegiate Student Loan Trust 2007-1 (Mar. 7, 2007), https://www.sec.gov/Archives/edgar/data/1223029/000089968107000201/national-424b5_030207.htm.

[14] *See* Prospectus Supplement, National Collegiate Student Loan Trust 2007-3 (Sept. 17, 2007), https://www.sec.gov/Archives/edgar/data/1223029/000110465907069961/a07-23573_18424b5.htm.

or about November 3, 2014, Transworld was owned by Expert Global Solutions, Inc.  Transworld is the successor to Defendant NCO Financial Systems, Inc.

32.     Defendant NCO Financial Systems, Inc., presently doing business as EGS Financial Care, Inc., is a Pennsylvania corporation that maintains offices at 400 Horsham Road, Suite 130, Horsham, Pennsylvania 19044.  NCO does business in New York and regularly attempts to collect debts alleged to be due to another.

33.     Defendant Forster & Garbus LLP is a law firm, located at 60 Motor Parkway, Commack, New York 11725.  Forster does business in New York and regularly attempts to collect debts alleged to be due to another.  Forster has been retained by National Collegiate to collect on consumer debt that National Collegiate claims to own.  Pursuant to that retention, Forster files and maintains actions in New York State courts seeking debt collection.  As part of the filing of each such case, Forster, as it is obligated to do under New York State law, includes a certification pursuant to Rules of the Chief Administrator of the Courts (22 NYCRR) § 130-1.1a.

**Nonparty PHEAA**

34.     Nonparty Pennsylvania Higher Education Assistance Agency ("PHEAA"), also doing business as American Education Services or AES/PA, is on information and belief a public corporation, organized under the laws of the Commonwealth of Pennsylvania.  On information and belief, PHEAA does business in New York and regularly attempts to collect debts alleged to be due to another.  PHEAA has been retained by National Collegiate to collect on consumer debt that National Collegiate claims to own.  PHEAA collects money on most student loans purportedly owned by National Collegiate early in National Collegiate's collections process, before such loan accounts are transferred to NCO and/or Transworld for litigation-based collection efforts.

## CLASS ALLEGATIONS

35.     This action is brought on behalf of Plaintiffs individually and as a class action on behalf of the following class ("Class"):

> (a) all persons sued in state-court lawsuits related to the collection of consumer debt, (b) in which any Trust Defendant was identified as plaintiff in the complaint, (c) within ten years of the date of the filing of this action. Excluded from the Class are the officers and directors of any Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest, at all relevant times.

36.     While the exact number of Class members can only be determined through appropriate discovery, Plaintiffs believe that there are thousands of members of the Class.

37.     Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct, as complained of herein.

38.     There are common questions of law and fact affecting members of the Class, which common questions predominate over questions that might affect individual members.  These questions include, but are not limited to, the following:

> a.      Whether Defendants initiated state-court lawsuits against consumers without the intent or ability to prove the claims;
>
> b.      Whether Defendants filed materially deceptive pleadings and/or motions in connection with said lawsuits;
>
> c.      Whether Plaintiffs and the other members of the Class are entitled to damages, including punitive damages, costs, and/or attorneys' fees, for Defendants' acts and conduct as alleged herein, and the proper measure thereof.

39.     Plaintiffs will fairly and adequately represent the other members of the Class. Plaintiffs have no interests that conflict with the interests of other Class members.  Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation.

40.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members might be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

41.     Members of the Class can be identified from records maintained by Defendants, and can be notified of the pendency of this action by United States mail using a form of notice customarily used in similar class actions.

## FACTS

### National Collegiate

42.     At $1.3 trillion, the student loan debt load is second only to that of mortgages in terms of size and risk posed to American consumers.  National Collegiate holds $12 billion of this debt, with more than $5 billion of it now classed as in default.

43.     National Collegiate and its agents file baseless state-court collection suits supported by boilerplate, robosigned legal filings that are unsupported by actual admissible evidence.

44.     National Collegiate and its agents engage in such tactics, because National Collegiate's constituent Trusts were too removed from any actual loan origination process to guarantee access to documentation evidencing a consumer's indebtedness.

45.     National Collegiate's constituent Trusts were created between approximately 2001 and 2007 by First Marblehead Corp.  Through subsidiary The National Collegiate Funding LLC, First Marblehead Corp. purchased, in bulk, student loans that had been originated by large lenders.  The National Collegiate Funding LLC later sold those loans to one of the Trusts.  Each Trust then issued asset-backed securities.

**NCO and Transworld**

46.     As National Collegiate's Trusts have no employees, all acts performed nominally by a Trust, or on its behalf, are actually done by servicing agents or attorneys hired by these servicing agents.

47.     The servicing agents began debt collection activities against consumers once their loans were determined to be in default.  They also accepted payments made by consumers in response to these collection efforts, and oversaw custody of the resulting moneys.

48.     As of 2013, Defendant NCO acted as National Collegiate's servicing agent.

49.     On or about November 1, 2014, Defendant Transworld became National Collegiate's servicing agent.[15]

50.     The same personnel, practices, and form documents were employed by NCO and Transworld in collecting the National Collegiate debts before and after the changeover from NCO to Transworld.

51.     Transworld—like NCO before it—has maintained a nationwide network of debt-collection law firms, including Forster ("Network Firms"), through which it coordinates and implements collections on National Collegiate's behalf.[16]

52.     Network Firms work on a contingency basis.

53.     Network Firms are not permitted to contact National Collegiate directly, even for the purpose of obtaining requisite proof of a consumer's indebtedness on a student loan, and/or National Collegiate's entitlement to sue thereupon.

---

[15] NCO and Transworld were both owned by Expert Global Solutions, Inc. until November 2014, when Transworld was sold to Platinum Equity.

[16] Before such litigation-based collection efforts are initiated, most loans allegedly owned by one of National Collegiate's trust have been serviced by PHEAA.

54.     NCO and Transworld grade Network Firms on, among other indices, the rate at which they file suit against consumers on behalf of National Collegiate, and the speed with which judgments in such suits are procured and collected upon.

55.     NCO and Transworld support staff work with non-attorney support staff at Network Firms to facilitate the prosecution of collection actions against consumers like Plaintiffs.

56.     This coordination includes the content of state-court pleadings, and the preparation of affidavits necessary to procure judgments against consumers.

**Forster**

57.     Forster is a debt collection law firm that exclusively, or nearly exclusively, represents purported creditors (both original and debt buyers) in state-court actions against consumers.

58.     Forster has filed hundreds, if not thousands, of state-court lawsuits against New Yorkers allegedly indebted to a National Collegiate Trust.

59.     Forster's court filings on behalf of National Collegiate were mass-produced by non-lawyers at the push of a button, and then signed by attorneys who had done nothing to confirm the validity of the allegations and claims lodged against the consumer-defendants, including Plaintiffs.

60.     Forster did not possess, and did not review, any actual documentary support for the actions it prosecuted against any Plaintiff on any Trust Defendant's behalf.

61.     Forster's debt-collection litigation activities, including against Plaintiffs, are dependent upon: (1) a computer system used to communicate with clients like National Collegiate and Transworld, and to automatically generate court filings in actions against consumers like Plaintiffs; and (2) a non-attorney support staff that far outnumbers Forster's attorneys.

62.     Like all of Forster's litigation filings on behalf of National Collegiate, the pleadings

filed against Plaintiffs were automatically generated based on a preexisting template.  These boilerplate pleadings are identical, save for the dates and the few pieces of information that have been auto-populated into the template using the electronic data provided by Transworld or NCO concerning the consumer being sued.

63.   Like all New York State attorneys, Forster's lawyers are obligated, under Rules of the Chief Administrator of the Courts (22 NYCRR) §§ 130-1.1 & 130-1.1a, to conduct a reasonable investigation into the legal and factual basis of any civil action that they initiate and maintain on a client's behalf.

64.   Forster attorneys ignore this obligation, robosigning National Collegiate complaints, and maintaining the actions for National Collegiate's benefit, without conducting such reasonable investigation.

65.   Indeed, during the time period relevant here, Forster's handful of attorneys signed so many complaints on a daily basis—not just for National Collegiate, but also for the country's largest credit card debt buyers—that it was impossible for them to conduct such reasonable investigation.

66.   The default-judgment filings that Forster submits on National Collegiate's behalf are similarly auto-generated and robosigned, and/or filed in state courts without meaningful attorney review.

**Defendants Target Plaintiffs**

***Plaintiff Francis Butry***

67.   On or about November 15, 2013, Forster initiated a lawsuit against Plaintiff Butry, in Tonawanda City Court, in which Trust 2005-3 was named as plaintiff, and Plaintiff Butry as defendant.  The case caption and index number are: *National Collegiate Student Loan Trust 2005-*

*3 v. Butry*, No. 265-13/TO.

68.     This lawsuit was initiated at the direction, express or implied, of Transworld and/or NCO.

69.     On information and belief, the complaint in this lawsuit was prepared using a boilerplate template.  The same boilerplate complaint was used in hundreds, if not thousands, of cases that Forster filed on National Collegiate's behalf.

70.     The complaint against Plaintiff Butry accused him of being in default upon a promissory note agreement and set forth causes of action for breach of contract and account stated.

71.     The complaint stated, among other things, that "DEFENDANT[ i.e., Mr. Butry] BORROWED MONEY FROM PLAINTIFF [i.e., Trust 2005-3] OR PLAINTIFF'S ASSIGNOR . . . ."

72.     The above statement is false, because Trust 2005-3 did not lend the purported loan underlying the alleged debt being sued upon.  Nor did the entity that purportedly assigned this alleged loan to Trust 2005-3 pursuant to National Collegiate's complex securitization process.

73.     The statement is unlawful, because unsophisticated consumers like Plaintiff Butry might not realize that they are dealing with an entity far removed from the actual lending of money—and thus less likely to possess proof of indebtedness.[17]

74.     The complaint against Plaintiff Butry does not identify the entity that actually lent this purported loan, to the extent it even exists and/or was extended to Plaintiff Butry.[18]

---

[17]  *See Winslow*, 2017 U.S. Dist. LEXIS 205113, at *2 n.1, *27–29.

[18]  It is a violation of the FDCPA, among other law, to fail to identify the originating lender in a state-court collection suit brought on behalf of an assignee of the purported loan underlying the alleged debt. *Bartell v. Nat'l Collegiate Student Loan Trust 2005-3*, No. 14-cv-04238-RS, 2015 U.S. Dist. LEXIS 54921, at *16–17 (N.D. Cal. Apr. 27, 2015) (upholding claims against Trust defendant and NCO for this misconduct).

75.     The complaint also states that Trust 2005-3 "IS AUTHORIZED TO PROCEED WITH THIS ACTION."  This statement is false, because Trust 2005-3 failed to file a certificate of designation with the New York State Department of State and is not permitted to maintain a lawsuit in New York.

76.     New York law requires that "[a]ny association doing business within this state . . . shall not maintain any action . . . in this state unless and until such association has filed the certificate of designation prescribed by [statute] and it has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without having filed" the required designation.  N.Y. Gen. Ass'ns Law § 18(4).

77.     An "association" for the purposes of this law includes any "business trust," defined as "any association operating a business under a written instrument or declaration of trust, the beneficial interest under which is divided into shares represented by certificates."  N.Y. Gen. Ass'ns Law § 2(2).

78.     Trust 2005-3 is a "business trust" for the purposes of this law.

79.     Trust 2005-3 is "doing business" in New York for purposes of this law based upon numerous indicia, including, but not limited to, the following:

    a.     Trust 2005-3 maintains offices at 230 Park Avenue, and 100 Wall Street, in Manhattan.

    b.     Trust 2005-3 has undertaken extensive debt collection efforts in New York, including taking pre-litigation collection action against thousands of New York consumers, and bringing at least 260 state-court collection actions in New York

courts over the past ten years.[19]

    c.    The documents defining Trust 2005-3's activities are virtually entirely focused on New York as the locus of all activity related to it.  For example, these documents state that the finance settlement is to take place in New York; require Trust 2005-3 to maintain an office in Manhattan, New York City, for transfer- or exchange-registration purposes; specify application of New York law with regard to, for example, offered securities, the indenture, the administration agreement, and the back-up administration agreement; the securities—the offering of which is Trust 2005-3's purpose—will be offered through and "will be ready for delivery in book-entry form only through the facilities of The Depository Trust Company in New York, New York," which "is a New York-chartered limited-purpose trust company"; and Trust 2005-3's administrator, First Marblehead Data Services, Inc., has a principal place of business in New York City.

80.    The complaint that Forster filed against Plaintiff Butry on behalf of Trust 2005-3 contains a Rule 130-1.1a certification attesting that the signing attorney had engaged in meaningful review of the claims being lodged on Trust 2005-3's behalf.

81.    As no such meaningful review had occurred, this Rule 130-1.1a certification was false.

82.    The complaint against Plaintiff Butry sought $8,077.03.  No delineation was provided as to the extent to which this amount reflected interest or charges rather than principal.

83.    On or about March 5, 2014, Forster, on behalf of Trust 2005-3, filed an application

---

[19]  Because these figures encompass only those courts participating in the New York State Unified Court System's "eCourts" program, they represent a low estimate.

for default judgment in this action against Plaintiff Butry.

84.     Submitted in conjunction with this application was an affidavit from NCO employee Jonathan Boyd, who testified that: "I am competent and authorized to testify relating to this action through personal knowledge of the business records, including the electronic data, sent to NCO that detail the education loan records."

85.     On information and belief, Mr. Boyd lacked personal knowledge of the business records, including the electronic data, showing that Plaintiff Butry owed the alleged debt in question.

86.     Mr. Boyd was instructed to review data on a computer screen to verify information in the affidavit about this alleged debt.  However, he did not know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether the data meant that the debt was in fact owed to Trust 2005-3.

87.     Mr. Boyd further testified through the affidavit that: "I also have personal knowledge of the record management practices and procedures of [Trust 2005-3] and the practices and procedures [Trust 2005-3] requires of its loan servicers and other agents."

88.     On information and belief, Mr. Boyd lacked personal knowledge of the record management practices and procedures of Trust 2005-3 and the practices and procedures of its agents.

89.     Mr. Boyd's affidavit against Plaintiff Butry was purportedly notarized by Danielle Gray, a Cobb County, Georgia, Notary Public, on Feb. 18, 2014.  The affidavit also contains a certification, from Georgia attorney Kristian Knochel (Georgia Bar # 426673), swearing that the affidavit's notarization was lawfully performed.

90.     On information and belief, this notarization was defective for various reasons,

including, but not limited to:

    a.  Mr. Boyd executed this affidavit outside the presence of Ms. Gray;

    b.  Ms. Gray did not place Mr. Boyd under oath before Mr. Boyd signed it.

91.    The default judgment application that Forster filed against Plaintiff Butry on behalf of Trust 2005-3 contains the signature of Forster attorney Joel Leiderman, who thereby certified pursuant to Rule 130-1.1a that he had engaged in meaningful review of the claims made on Trust 2005-3's behalf.

92.    As no such meaningful review had occurred, this Rule 130-1.1a certification was false.

93.    Mr. Leiderman and Forster knew when they filed Mr. Boyd's affidavit that it was not based on the requisite personal knowledge of proof of indebtedness.[20]  They filed this affidavit anyway, because under New York law they could not have procured the default judgment against Plaintiff Butry without an affidavit of "proof of the facts constituting the claim . . . and the amount due . . . ."  CPLR 3215(f).

94.    Moreover, Mr. Leiderman made a materially false statement in the affirmation that he submitted in support of the application for default judgment against Plaintiff Butry.  Mr. Leiderman described Trust 2005-3 as "an original creditor . . . ."  This statement is false, because Trust 2005-3 did not originate the purported loan underlying the alleged debt being sued upon.[21]

95.    Any statement characterizing a National Collegiate Trust as an "original creditor"

---

[20]  Among other defects, this affidavit violated New York law, because it was impermissibly created by a <u>nonparty</u> (NCO).  <u>Only</u> "<u>the party</u>" seeking judgment—here, Trust 2005-3—may swear out the requisite affidavit of proof in support of a default judgment application.  CPLR 3215(f) (emphasis added).

[21]  Indeed, <u>no</u> National Collegiate Trust is <u>ever</u> the "original creditor" for any alleged loan underlying any alleged debt that Defendants sue over.

is unlawful, because unsophisticated consumers like Plaintiff Butry might not realize that they are dealing with an entity far removed from the actual loan origination—and thus less likely to possess proof of indebtedness.[22]

96.     By applying for default judgment, Trust 2005-3, Forster, and NCO and/or Transworld represented, expressly or by implication, that they possessed and had reviewed proof of indebtedness, including proof that Trust 2005-3 owned the alleged debt in question.  In fact, they did not possess, and had not reviewed, such proof.

97.     The application for default judgment against Plaintiff Butry was granted by the Tonawanda City Court Clerk on or about March 5, 2014.  With costs and fees added to the amount sought in the complaint, the total judgment amount was $8,314.53.

98.     On information and belief, the Erie County Clerk thereafter recorded a lien in connection with this default judgment, and Forster, on behalf of Trust 2005-3, then caused an income execution to be issued to at least one employer for Plaintiff Butry in conjunction with this default judgment.

99.     On information and belief, Plaintiff Butry's wages have been garnished due to this income execution.

100.     On information and belief, Defendants have falsely reported to credit bureaus that the underlying alleged debt was valid and owed, negatively affecting Plaintiff Butry's credit, and thereby causing him economic and noneconomic harm.

***Plaintiff Cori Frauenhofer***

101.     On or about June 28, 2013, Forster initiated a lawsuit against Plaintiff Frauenhofer, in Erie County Supreme Court, in which National Collegiate Student Loan Trust 2006-1 ("Trust

---

[22] *See Winslow*, 2017 U.S. Dist. LEXIS 205113, at *2 n.1, *27–29.

2006-1") was named as plaintiff, and Plaintiff Frauenhofer as defendant.  The case caption and index number are: *National Collegiate Student Loan Trust 2006-1 v. Frauenhofer*, No. 603772/2013 (Erie Cnty.).

102.     This lawsuit was initiated at the direction, express or implied, of Transworld and/or NCO.

103.     On information and belief, the complaint in this lawsuit was prepared using a boilerplate template.  The same boilerplate complaint was used in hundreds, if not thousands, of cases that Forster filed on National Collegiate's behalf.

104.     The complaint against Plaintiff Frauenhofer accused her of being in default upon a promissory note agreement and set forth causes of action for breach of contract and account stated.

105.     The complaint stated, among other things, that "DEFENDANT[ i.e., Ms. Frauenhofer] BORROWED MONEY FROM PLAINTIFF [i.e., Trust 2006-1] OR PLAINTIFF'S ASSIGNOR . . . ."

106.     The above statement is false, because Trust 2006-1 did not lend the purported loan underlying the alleged debt being sued upon.  Nor did the entity that purportedly assigned this alleged loan to Trust 2006-1 pursuant to National Collegiate's complex securitization process.

107.     The statement is unlawful, because unsophisticated consumers like Plaintiff Frauenhofer might not realize that they are dealing with an entity far removed from the actual lending of money—and thus less likely to possess proof of indebtedness.[23]

108.     The complaint does not identify the entity that actually originated this purported loan, to the extent it even exists and/or was extended to Plaintiff Frauenhofer.[24]

---

[23] *See Winslow*, 2017 U.S. Dist. LEXIS 205113, at *2 n.1, *27–29.

[24] It is a violation of the FDCPA, among other law, to fail to identify the originating lender in a state-court collection suit brought on behalf of an assignee of the purported loan underlying the

109.    The complaint also states that Trust 2006-1 "IS AUTHORIZED TO PROCEED WITH THIS ACTION."  This statement is false, because Trust 2006-1 failed to file a certificate of designation with the New York State Department of State and is not permitted to maintain a lawsuit in New York.

110.    New York law requires that "[a]ny association doing business within this state . . . shall not maintain any action . . . in this state unless and until such association has filed the certificate of designation prescribed by [statute] and it has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without having filed" the required designation.  N.Y. Gen. Ass'ns Law § 18(4).

111.    An "association" for the purposes of this law includes any "business trust," defined as "any association operating a business under a written instrument or declaration of trust, the beneficial interest under which is divided into shares represented by certificates."  N.Y. Gen. Ass'ns Law § 2(2).

112.    Trust 2006-1 is a "business trust" for the purposes of this law.

113.    Trust 2006-1 is "doing business" in New York for purposes of this law based upon numerous indicia, including, but not limited to, the following:

a.    Trust 2006-1 maintains offices at 100 Wall Street, in Manhattan.

b.    Trust 2006-1 has undertaken extensive debt collection efforts in New York, including taking pre-litigation collection action against thousands of New York consumers, and bringing at least 320 state-court collection actions in New York

---

alleged debt.  *Bartell*, 2015 U.S. Dist. LEXIS 54921, at *16–17 (upholding claims against Trust defendant and NCO for this misconduct).

courts over the past ten years.[25]

    c.    The documents defining Trust 2006-1's activities are virtually entirely focused on New York as the locus of all activity related to it.  For example, these documents state that the finance settlement is to take place in New York; require Trust 2006-1 to maintain an office in Manhattan, New York City, for transfer- or exchange-registration purposes; specify application of New York law with regard to, for example, offered securities, the indenture, the administration agreement, and the back-up administration agreement; the securities—the offering of which is Trust 2006-1's purpose—will be "delivered" in "Book Entry" form to "The Depository Trust Company" which "is a New York corporation"; and Trust 2006-1's administrator, First Marblehead Data Services, Inc., has a principal place of business in New York City.

114.    The complaint that Forster filed against Plaintiff Frauenhofer on behalf of Trust 2006-1 contains a Rule 130-1.1a certification attesting that the signing attorney had engaged in meaningful review of the claims being lodged on Trust 2006-1's behalf.

115.    As no such meaningful review had occurred, this Rule 130-1.1a certification was false.

116.    The complaint against Plaintiff Frauenhofer sought $20,437.81.  No delineation was provided as to the extent to which this amount reflected interest or charges rather than principal.

117.    On or about January 3, 2014, Forster, on behalf of Trust 2006-1, filed an application

---

[25]  Because these figures encompass only those courts participating in the New York State Unified Court System's "eCourts" program, they represent a low estimate.

for default judgment in this action against Plaintiff Frauenhofer.

118.   Submitted in conjunction with this application was an affidavit from NCO employee Chandra Alphabet, who testified that: "I am competent and authorized to testify relating to this action through personal knowledge of the business records, including the electronic data, sent to NCO that detail the education loan records."

119.   On information and belief, Ms. Alphabet lacked personal knowledge of the business records, including the electronic data, showing that Plaintiff Frauenhofer owed the alleged debt in question.

120.   Ms. Alphabet was instructed to review data on a computer screen to verify information in the affidavit about this alleged debt.  However, she did not know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether the data meant that the debt was in fact owed to Trust 2006-1.

121.   Ms. Alphabet further testified through the affidavit that: "I also have personal knowledge of the record management practices and procedures of [Trust 2006-1] and the practices and procedures [Trust 2006-1] requires of its loan servicers and other agents."

122.   On information and belief, Ms. Alphabet lacked personal knowledge of the record management practices and procedures of Trust 2006-1 and the practices and procedures of its agents.

123.   Ms. Alphabet's affidavit against Plaintiff Frauenhofer was purportedly notarized by Colleen Y. Morgan, a Gwinnett County, Georgia, Notary Public, on December 18, 2013.  The affidavit also contains a certification, from Georgia attorney Kristian Knochel (Georgia Bar # 426673), swearing that the affidavit's notarization was lawfully performed.

124.   On information and belief, this notarization was defective for various reasons,

including, but not limited to:

       a.   Ms. Alphabet executed this affidavit outside the presence of Ms. Morgan;

       b.   Ms. Morgan did not place Ms. Alphabet under oath before Ms. Alphabet signed it.

125.    The default judgment application that Forster filed against Plaintiff Frauenhofer on behalf of Trust 2006-1 contains the signature of Forster attorney Joel Leiderman, who thereby certified pursuant to Rule 130-1.1a that he had engaged in meaningful review of the claims made on Trust 2006-1's behalf.

126.    As no such meaningful review had occurred, this Rule 130-1.1a certification was false.

127.    Mr. Leiderman and Forster knew when they filed Ms. Alphabet's affidavit that it was not based on the requisite personal knowledge of proof of indebtedness.[26]  They filed this affidavit anyway, because under New York law they could not have procured the default judgment against Plaintiff Frauenhofer without an affidavit of "proof of the facts constituting the claim . . . and the amount due . . . ."  CPLR 3215(f).

128.    Moreover, Mr. Leiderman made a materially false statement in the affirmation that he submitted in support of the application for default judgment against Plaintiff Frauenhofer.  Mr. Leiderman described Trust 2006-1 as "an original creditor . . . ."  This statement is false, because Trust 2006-1 did not originate the purported loan underlying the alleged debt being sued upon.[27]

129.    Any statement characterizing a National Collegiate Trust as an "original creditor"

---

[26]  Among other defects, this affidavit violated New York law, because it was impermissibly created by a <u>nonparty</u> (NCO).  <u>Only</u> "<u>the party</u>" seeking judgment—here, Trust 2006-1—may swear out the requisite affidavit of proof in support of a default judgment application.  CPLR 3215(f) (emphasis added).

[27]  Indeed, <u>no</u> National Collegiate Trust is <u>ever</u> the "original creditor" for any alleged loan underlying any alleged debt that Defendants sue over.

is unlawful, because unsophisticated consumers like Plaintiff Frauenhofer might not realize that they are dealing with an entity far removed from the actual loan origination—and thus less likely to possess proof of indebtedness.[28]

130.     By applying for default judgment, Trust 2006-1, Forster, and NCO and/or Transworld represented, expressly or by implication, that they possessed and had reviewed proof of indebtedness, including proof that Trust 2006-1 owned the alleged debt in question.  In fact, they did not possess, and had not reviewed, such proof.

131.     The application for default judgment against Plaintiff Frauenhofer was granted by the Erie County Clerk on or about January 3, 2014.  With costs and fees added to the amount sought in the complaint, the total judgment amount was $20,967.81.

132.     On information and belief, the Erie County Clerk thereafter recorded a lien in connection with this default judgment, and Forster, on behalf of Trust 2006-1, then caused an income execution to be issued to at least one employer for Plaintiff Frauenhofer in conjunction with this default judgment.

133.     On information and belief, Plaintiff Frauenhofer's wages have been garnished due to this income execution.

134.     On information and belief, Defendants have falsely reported to credit bureaus that the underlying alleged debt was valid and owed, negatively affecting Plaintiff Frauenhofer's credit, and thereby causing her economic and noneconomic harm.

### Plaintiffs Sandra Tabar and Jaelysabel Villasante

135.     On or about January 14, 2014, Forster initiated a lawsuit against Plaintiffs Tabar and Villasante, in Bronx County Civil Court, in which Trust 2007-1 was named as plaintiff, and

---

[28]  *See Winslow*, 2017 U.S. Dist. LEXIS 205113, at *2 n.1, *27–29.

Ms. Tabar and Ms. Villasante as co-defendants.  The case is: *National Collegiate Student Loan Trust 2007-1 v. Villasante*, No. 760-14/BX.

136.     Also on or about January 14, 2014, Forster initiated a lawsuit against Plaintiffs Tabar and Villasante, in Bronx County Civil Court, in which Trust 2007-3 was named as plaintiff, and Ms. Tabar and Ms. Villasante as co-defendants.  The case is: *National Collegiate Student Loan Trust 2007-3 v. Villasante*, No. 762-14/BX.

137.     Each lawsuit was initiated at the direction of Transworld and/or NCO.

138.     The complaints in these lawsuits were prepared using a boilerplate template.  The same boilerplate complaint was used in hundreds, if not thousands, of cases that Forster filed on National Collegiate's behalf.

139.     The complaints against Ms. Tabar and Ms. Villasante accused them of being in default upon a promissory note agreement and set forth causes of action for breach of contract and account stated.

140.     Trust 2007-1's complaint against Ms. Tabar and Ms. Villasante stated, among other things, that "PLAINTIFF [*i.e.,* Trust 2007-1] IS THE ORIGINAL CREDITOR . . . ."

141.     The above statement is false, because Trust Defendant 2007-1 did not originate the purported agreement underlying the alleged debt being sued upon.

142.     Trust 2007-1's complaint also stated that "DEFENDANT[S i.e., Ms. Tabar and Ms. Villasante] BORROWED MONEY FROM PLAINTIFF [i.e., Trust 2007-1] OR PLAINTIFF'S ASSIGNOR . . . ."

143.     This statement is false, because Trust 2007-1 did not lend the purported loan underlying the alleged debt being sued upon.  Nor did the entity that purportedly assigned this alleged loan to Trust 2007-1 pursuant to National Collegiate's complex securitization process.

144. Trust 2007-3's complaint against Ms. Tabar and Ms. Villasante stated, among other things, that "PLAINTIFF [*i.e.,* Trust 2007-3] IS THE ORIGINAL CREDITOR . . . ."

145. The above statement is false, because Trust Defendant 2007-3 did not originate the purported agreement underlying the alleged debt being sued upon.

146. Trust 2007-3's complaint also stated that "DEFENDANT[S i.e., Ms. Tabar and Ms. Villasante] BORROWED MONEY FROM PLAINTIFF [i.e., Trust 2007-3] OR PLAINTIFF'S ASSIGNOR . . . ."

147. This statement is false, because Trust 2007-3 did not lend the purported loan underlying the alleged debt being sued upon. Nor did the entity that purportedly assigned this alleged loan to Trust 2007-3 pursuant to National Collegiate's complex securitization process.

148. The above-quoted statements are unlawful, because unsophisticated consumers like Plaintiffs Tabar and Villasante might not realize that they are dealing with an entity far removed from the actual lending of money—and thus less likely to possess proof of indebtedness.[29]

149. Neither complaint identified the entity that did actually originate the purported agreement, to the extent it even exists.[30]

150. Trust 2007-1's complaint also stated that Trust 2007-1 "IS AUTHORIZED TO PROCEED WITH THIS ACTION."

151. The above statement is false, because Trust 2007-1 failed to file a certificate of designation with the New York State Department of State and is not permitted to maintain a lawsuit in New York.

---

[29] *See Winslow*, 2017 U.S. Dist. LEXIS 205113, at *2 n.1, *27–29.

[30] In addition to other law, New York City Administrative Code § 20-493.1 specifically requires that "the originating creditor of the debt" be identified in any debt-collection "communication with [a] consumer . . . ."

152.    New York law requires that any "[a]ny association doing business within this state . . . shall not maintain any action . . . in this state unless and until such association has filed the certificate of designation prescribed by [statute] and it has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without having filed" the required designation.  N.Y. Gen. Ass'ns Law § 18(4).

153.    An "association" for the purposes of this law includes any "business trust," defined as "any association operating a business under a written instrument or declaration of trust, the beneficial interest under which is divided into shares represented by certificates."  N.Y. Gen. Ass'ns Law § 2(2).

154.    Trust 2007-1 is a "business trust" for the purposes of this law.

155.    Trust 2007-1 is "doing business" in New York for purposes of this law based upon numerous indicia, including, but not limited to, the following:

a.    Trust 2007-1 maintains offices at 230 Park Avenue, and 100 Wall Street, in Manhattan.

b.    Trust 2007-1 has undertaken extensive debt collection efforts in New York, including taking pre-litigation collection action against thousands of New York consumers, and bringing at least 390 state-court collection actions in New York courts over the past ten years.[31]

c.    The documents defining Trust 2007-1's activities are focused on New York as the locus of all activity related to it.  For example, these documents state that the finance settlement is to take place in New York; require Trust 2007-1 to maintain

---

[31]  Because these figures encompass only those courts participating in the New York State Unified Court System's "eCourts" program, they represent a low estimate.

an office in Manhattan, New York City, for transfer- or exchange-registration purposes; specify application of New York law with regard to, for example, offered securities, the indenture, the administration agreement, and the back-up administration agreement; the securities—the offering of which is Trust 2007-1's purpose—will be "delivered" in "Book Entry" form to "The Depository Trust Company" which "is a New York corporation"; and Trust 2007-1's administrator, First Marblehead Data Services, Inc., has a principal place of business in New York City.

156.    Trust 2007-3's complaint also stated that Trust 2007-3 "IS AUTHORIZED TO PROCEED WITH THIS ACTION."

157.    The above statement is false, because Trust 2007-3 failed to file a certificate of designation with the New York State Department of State and is not permitted to maintain a lawsuit in New York.

158.    New York law requires that any "[a]ny association doing business within this state . . . shall not maintain any action . . . in this state unless and until such association has filed the certificate of designation prescribed by [statute] and it has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without having filed" the required designation.  N.Y. Gen. Ass'ns Law § 18(4).

159.    An "association" for the purposes of this law includes any "business trust," defined as "any association operating a business under a written instrument or declaration of trust, the beneficial interest under which is divided into shares represented by certificates."  N.Y. Gen. Ass'ns Law § 2(2).

160.    Trust 2007-3 is a "business trust" for the purposes of this law.

30

161.    Trust 2007-3 is "doing business" in New York for purposes of this law based upon numerous indicia, including, but not limited to, the following:

a.    Trust 2007-3 maintains offices at 230 Park Avenue, and 100 Wall Street, in Manhattan.

b.    Trust 2007-3 has undertaken extensive debt collection efforts in New York, including taking pre-litigation collection action against thousands of New York consumers, and bringing at least 260 state-court collection actions in New York courts over the past ten years.[32]

c.    The documents defining Trust 2007-3's activities are focused on New York as the locus of all activity related to it.  For example, these documents state that the finance settlement is to take place in New York; require Trust 2007-3 to maintain an office in Manhattan, New York City, for transfer- or exchange-registration purposes; specify application of New York law with regard to, for example, offered securities, the indenture, the administration agreement, and the back-up administration agreement; the securities—the offering of which is Trust 2007-3's purpose— will be offered through and "will be ready for delivery in book-entry form only through the facilities of The Depository Trust Company in New York, New York," which "is a New York-chartered limited-purpose trust company"; and Trust 2007-3's administrator, First Marblehead Data Services, Inc., has a principal place of business in New York City.

162.    The complaint that Forster filed against Plaintiffs Tabar and Villasante on behalf of

---

[32]  Because these figures encompass only those courts participating in the New York State Unified Court System's "eCourts" program, they represent a low estimate.

Trust 2007-1 contains a Rule 130-1.1a certification attesting that the signing attorney had engaged in meaningful review of the claims being lodged on Trust 2007-1's behalf.

163.    As no such meaningful review had occurred, this Rule 130-1.1a certification was false.

164.    Trust 2007-1's complaint filed against Plaintiffs Tabar and Villasante sought $23,233.32.  No delineation was provided as to the extent to which this amount reflected interest and charges rather than principal.

165.    The complaint that Forster filed against Plaintiffs Tabar and Villasante on behalf of Trust 2007-3 contains a Rule 130-1.1a certification attesting that the signing attorney had engaged in meaningful review of the claims being lodged on Trust 2007-3's behalf.

166.    As no such meaningful review had occurred, this Rule 130-1.1a certification was false.

167.    Trust 2007-3's complaint filed against Plaintiffs Tabar and Villasante sought $16,651.39.  No delineation was provided as to the extent to which this amount reflected interest and charges rather than principal.

168.    The summonses filed along with both of these complaints identified an address in the Bronx as the address for Ms. Tabar and Ms. Villasante.

169.    On or about February 27, 2014, affidavits of service were submitted in connection with these lawsuits.  The affidavits were signed by Kerron Melville (License # 1314097) of Progress Process Service Inc.   Mr. Melville swore that he had served the summonses and complaints upon Ms. Tabar and Ms. Villasante by going to the Bronx address listed in the summons and leaving copies of these documents with a "john doe[] CO-TENANT" [sic] of Ms. Tabar and Ms. Villasante.  Mr. Melville further swore that he had deposited copies of these

documents in the mail.

170.    These sworn statements by Mr. Melville were false.

171.    On or about April 3, 2014, Forster, on behalf of Trust 2007-1, filed an application for default judgment in the Trust 2007-1 action against Ms. Tabar and Ms. Villasante.

172.    Submitted in conjunction with this application was an affidavit from NCO employee Dudley Turner, who testified that: "I am competent and authorized to testify relating to this action through personal knowledge of the business records, including the electronic data, sent to NCO that detail the education loan records."

173.    Mr. Turner lacked personal knowledge of the business records, including the electronic data, showing that Ms. Tabar and/or Ms. Villasante owed the alleged debt in question.

174.    Mr. Turner was instructed to review data on a computer screen to verify information in the affidavit about this alleged debt.  However, he did not know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether the data meant that the debt was in fact owed to Trust 2007-1.

175.    Mr. Turner further testified through the affidavit that: "I also have personal knowledge of the record management practices and procedures of [Trust 2007-1] and the practices and procedures [Trust 2007-1] requires of its loan servicers and other agents."

176.    Mr. Turner lacked personal knowledge of the record management practices and procedures of Trust 2007-1 and the practices and procedures of its agents.

177.    This affidavit by Mr. Turner against Ms. Tabar and Ms. Villasante was purportedly notarized by Danielle Gray, a Cobb County, Georgia, Notary Public, on February 18, 2014.  The affidavit also contains a certification, from Georgia attorney Kristian Knochel (Georgia Bar # 426673), swearing that the affidavit's notarization was lawfully performed.

178.   This notarization was defective for various reasons, including, but not limited to:

a.   Mr. Turner executed this affidavit outside the presence of Ms. Gray;

b.   Ms. Gray did not place Mr. Turner under oath before Mr. Turner signed it.

179.   The default judgment application that Forster filed against Ms. Tabar on behalf of Trust 2007-1 contains the signature of Forster attorney Joel Leiderman, who thereby certified pursuant to Rule 130-1.1a that he had engaged in meaningful review of the claims made on Trust 2007-1's behalf.

180.   As no such meaningful review had occurred, this Rule 130-1.1a certification was false.

181.   Mr. Leiderman and Forster knew when they filed Mr. Turner's affidavit in the Trust 2007-1 action that it was not based on the requisite personal knowledge of proof of indebtedness.[33] They filed this affidavit anyway, because under New York law they could not have procured the default judgment against Plaintiffs Villasante and Seaman without an affidavit of "proof of the facts constituting the claim . . . and the amount due . . . ."  CPLR 3215(f).

182.   By applying for default judgment, Trust 2007-1, Forster, and NCO and/or Transworld represented, expressly or by implication, that they possessed and had reviewed proof of indebtedness, including proof that Trust 2007-1 owned the alleged debt in question.  In fact, they did not possess, and had not reviewed, such proof.

183.   The application for default judgment in favor of Trust 2007-1 and against Plaintiffs Tabar and Villasante was granted by the Bronx County Civil Court Clerk on or about May 27,

---

[33]   Among other defects, this affidavit violated New York law, because it was impermissibly created by a <u>nonparty</u> (NCO).  <u>Only</u> "<u>the party</u>" seeking judgment—here, Trust 2007-1—may swear out the requisite affidavit of proof in support of a default judgment application.  CPLR 3215(f) (emphasis added).

2014.  With costs and fees added to the amount sought in the complaint, the total judgment amount was $23,513.32.

184.    On or about April 3, 2014, Forster, on behalf of Trust 2007-3, filed an application for default judgment in the Trust 2007-3 action against Ms. Tabar and Ms. Villasante.

185.    Submitted in conjunction with this application was an affidavit from NCO employee Dudley Turner, who testified that: "I am competent and authorized to testify relating to this action through personal knowledge of the business records, including the electronic data, sent to NCO that detail the education loan records."

186.    Mr. Turner lacked personal knowledge of the business records, including the electronic data, showing that Ms. Tabar and/or Ms. Villasante owed the alleged debt in question.

187.    Mr. Turner was instructed to review data on a computer screen to verify information in the affidavit about this alleged debt.  However, he did not know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether the data meant that the debt was in fact owed to Trust 2007-3.

188.    Mr. Turner further testified through the affidavit that: "I also have personal knowledge of the record management practices and procedures of [Trust 2007-3] and the practices and procedures [Trust 2007-3] requires of its loan servicers and other agents."

189.    Mr. Turner lacked personal knowledge of the record management practices and procedures of Trust 2007-3 and the practices and procedures of its agents.

190.    This affidavit by Mr. Turner against Ms. Tabar and Ms. Villasante was purportedly notarized by Danielle Gray, a Cobb County, Georgia, Notary Public, on February 18, 2014.  The affidavit also contains a certification, from Georgia attorney Kristian Knochel (Georgia Bar # 426673), swearing that the affidavit's notarization was lawfully performed.

191.    This notarization was defective for various reasons, including, but not limited to:

    a.    Mr. Turner executed this affidavit outside the presence of Ms. Gray;

    b.    Ms. Gray did not place Mr. Turner under oath before Mr. Turner signed it.

192.    The default judgment application that Forster filed against Ms. Tabar on behalf of Trust 2007-3 contains the signature of Forster attorney Joel Leiderman, who thereby certified pursuant to Rule 130-1.1a that he had engaged in meaningful review of the claims made on Trust 2007-3's behalf.

193.    As no such meaningful review had occurred, this Rule 130-1.1a certification was false.

194.    Mr. Leiderman and Forster knew when they filed Mr. Turner's affidavit in the Trust 2007-3 action that it was not based on the requisite personal knowledge of proof of indebtedness.[34] They filed this affidavit anyway, because under New York law they could not have procured the default judgment against Plaintiffs Villasante and Tabar without an affidavit of "proof of the facts constituting the claim . . . and the amount due . . . ."  CPLR 3215(f).

195.    By applying for default judgment, Trust 2007-3, Forster, and NCO and/or Transworld represented, expressly or by implication, that they possessed and had reviewed proof of indebtedness, including proof that Trust 2007-3 owned the alleged debt in question.  In fact, they did not possess, and had not reviewed, such proof.

196.    The application for default judgment in favor of Trust 2007-3 and against Plaintiffs Tabar and Villasante was granted by the Bronx County Civil Court Clerk on or about May 27,

---

[34]   Among other defects, this affidavit violated New York law, because it was impermissibly created by a nonparty (NCO).  Only "the party" seeking judgment—here, Trust 2007-3—may swear out the requisite affidavit of proof in support of a default judgment application.  CPLR 3215(f) (emphasis added).

2014.  With costs and fees added to the amount sought in the complaint, the total judgment amount was $16,931.39.

197.    On or about April 12, 2018, Plaintiffs Tabar and Villasante applied to the Bronx County Civil Court for orders to show cause to vacate the judgments against them.

198.    In their supporting affidavits, Plaintiff Tabar and Villasante stated that they had only recently learned of the judgments, and that there had not been proper service of the summonses and complaints that Forster filed against them on behalf of Trust 2007-1 and Trust 2007-3.

199.    Their affidavits noted that the purported process server in the matters, Kerron Melville, had been disciplined by the New York City Department of Consumer Affairs for dishonest conduct.  They stated that the affidavits of service filed against them by Mr. Melville described in-person service upon a male individual of whom they had no knowledge, and that they had never received a copy of the summons and complaint by mail, as Mr. Melville had sworn.

200.    Also through their affidavits, Plaintiffs Tabar and Villasante denied owing the alleged debts over which Trust 2007-1 and Trust 2007-3 had sued them, and asserted that Trust 2007-1 and Trust 2007-3 lacked standing to sue them.

201.    On or about June 18, 2018, the Bronx County Civil Court vacated both Trust 2007-1 and Trust 2007-3's default judgments against Plaintiffs Tabar and Villasante, and restored the cases to the trial calendar.

202.    On or about June 21, 2018, Plaintiffs Tabar and Villasante filed discovery demands respectively directing Trust 2007-1, Trust 2007-3 and Forster to provide them with "all records pertaining to the alleged debt," including:

- The entire history of payments, and all statements sent to the account holder.

- A detailed breakdown of all interest and fees that the Trust-plaintiff was seeking.

- All information and documents relating to the Trust-plaintiff's acquisition of the alleged debt, including, without limitation, executed copies of all assignments/transfers.

- All documents related to reporting made to any consumer reporting agencies.

203.    Between August 2018 and May 2019, Plaintiffs Tabar and Villasante went to the Bronx County Civil Court on four occasions for scheduled trial dates in the Trust 2007-1 and Trust 2007-3 actions.  As of the date of each such occasion, Trust 2007-1, Trust 2007-3, and Forster failed to respond to Ms. Tabar and Ms. Villasante's discovery demands, and the matters were adjourned to a later date.

204.    On October 1, 2019, Plaintiffs Tabar and Villasante appeared at Bronx County Civil Court for their fifth scheduled trial date.  Trust 2007-1, Trust 2007-3, and Forster had again failed to respond to Ms. Tabar and Ms. Villasante's discovery demands by the scheduled trial date.  The court dismissed both actions—over Trust 2007-1, Trust 2007-3, and Forster's objection—emphasizing the repeated failures to produce proof of their claims by the scheduled trial date.

205.    On information and belief, Trust 2007-1, Trust 2007-3 and Forster could not produce such proof, because they, and NCO and/or Transworld, never possessed it.

206.    Plaintiffs Tabar and Villasante have incurred economic and noneconomic harm because of the actions of Defendants Trust 2007-1, Trust 2007-3, Forster, and NCO and/or Transworld.  Among other pecuniary costs, they have had to spend money: copying the Bronx County Civil Court case file; on transportation to and from that courthouse on multiple occasions; and on effectuating service of process of the court filings submitted in seeking to have Trust 2007-1 and Trust 2007-3's judgments vacated and the actions dismissed.  In addition, they have had to

take time off of work and out of their personal lives to go to the courthouse on multiple occasions. Finally, they have suffered mental and emotional anguish and aggravation from, among other things, learning of the improperly obtained judgment against them years after the fact, and then having to litigate at the state-court level—which could have been avoided had Defendants Trust 2007-1, Trust 2007-3, Forster, and NCO and/or Transworld timely recognized their inability to pursue lawfully their actions against Ms. Tabar and Ms. Villasante.

207.    Moreover, on information and belief Forster, on behalf of Trust 2007-1, caused an income execution to be issued to at least one employer for Plaintiff Villasante in conjunction with the Trust 2007-1 default judgment.  On information and belief, Plaintiff Villasante's wages have been garnished due to this income execution.

**Defendants' Scheme Unravels**

208.    After many years in operation, and countless consumers victimized, a series of recent public events finally shed a spotlight on Defendants' scheme.

### *Donald Uderitz Speaks Out*

209.    Donald Uderitz is the founder of Vantage Capital Group, a private equity firm that is the beneficial owner of National Collegiate.  His company keeps whatever money is left after National Collegiate's noteholders are paid off.

210.    Mr. Uderitz granted an interview to the *New York Times* for a July 17, 2017 article about National Collegiate's systematic inability to produce proof of indebtedness and entitlement to sue.[35]

211.    Mr. Uderitz told the *New York Times* that an audit of Transworld which he had paid for revealed that, of a random sample of roughly 400 National Collegiate loans, not one had

---

[35]  *See supra* note 3.

paperwork evidencing the chain of ownership.

212.   As the *New York Times* article states:

> While Mr. Uderitz wants to collect money from students behind on their bills, he says he wants the lawsuits against borrowers to stop, at least until he can get more information about the documentation that underpins the loans.
>
> "It's fraud to try to collect on loans that you don't own," Mr. Uderitz said.  "We want no part of that." (emphasis added).

### The CFPB's Findings

213.   Several weeks after Mr. Uderitz's comments to the *New York Times*, the CFPB announced its findings against National Collegiate and Transworld following a years-long investigation.

214.   The CFPB penalized National Collegiate and Transworld for three categories of lawbreaking: (1) filing lawsuits without the intent or ability to prove the claims, if contested; (2) filing lawsuits over time-barred debt; and (3) filing false and misleading affidavits in support of lawsuits against consumers.

215.   As to the first category, filing baseless lawsuits, the CFPB found that, among other things:

> Defendants filed at least 1,214 collections lawsuits against consumers even though the documentation needed to prove they owned the loans was missing.  Through these lawsuits, the Defendants obtained approximately $21,768,807 in judgments against consumers. . . .
>
> In these lawsuits, documentation of a complete chain of assignment evidencing that the subject loan was transferred to the Defendants was missing. . . .
>
> In addition, the Defendants filed at least 812 collections lawsuits where the documentation did not support Trusts' ownership of the loans.  The chain of assignment documentation shows that these loans were allegedly transferred to Defendants before they were in fact disbursed to consumers. . . .

In at least 208 other collections lawsuits, the promissory note to prove that a debt was owed did not exist or cannot be located. . . .

For each collections lawsuit described [above], Defendants could not prove that a debt was owed to Defendants, if contested. . . .

Defendants knew, or their processes should have uncovered, that these chain of assignment documents were missing or flawed, yet Defendants continued to file collections lawsuits.[36]

216.     As to suing over time-barred alleged debts, the CFPB found that:

In at least 486 collections lawsuits, in connection with collecting or attempting to collect debt from consumers, Defendants filed a collections lawsuit outside the applicable statute of limitations.[37]

217.     As to the false and misleading affidavits, the CFPB found that, among other things:

In the[] affidavits, the affiants swore that they had personal knowledge of the education loan records evidencing the debt. . . .

In fact, in numerous instances, affiants lacked personal knowledge of the education loan records evidencing the debt when they executed the affidavits. . . .

The affiants also swore in the affidavits that they were authorized and competent to testify about the consumers' debts through review of and "personal knowledge" of the business records, including electronic data, in their possession. . . .

In fact, in numerous instances, affiants lacked personal knowledge of the business records, including the electronic data, showing that consumers owed debts to the Defendants. . . .

Affiants were instructed to review data on a computer screen to verify information in the affidavits about the debts.  Affiants, however, did not know the source of the data on that screen, how the data was obtained or

---

[36] Compl. ¶¶ 52–57, *Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Trust et al.*, No. 1:17-cv-01323-UNA (D. Del. Sept. 18, 2017) (Dkt. No. 1).  More recently, the CFPB has detailed how Forster, specifically, furthered this scheme by prosecuting state-court lawsuits for the benefit of National Collegiate's Trusts, where no meaningful attorney review of the validity of the claims being made had occurred.  Compl. ¶¶ 2–3, 33, 35, 41–46, *Consumer Fin. Prot. Bureau v. Forster & Garbus, LLP*, No. 2:19-cv-2928 (E.D.N.Y. May 17, 2019) (Dkt. No. 1).

[37] *Id.* ¶ 58.

maintained, whether it was accurate, or whether those data meant that the debt was in fact owed to Defendants. . . .

Each affiant also swore that he or she had "personal knowledge of the record management practices and procedures of Plaintiff [National Collegiate] and the practices and procedures Plaintiff requires of its loan servicers and other agents." . . .

In fact, affiants lacked personal knowledge of the record management practices and procedures of Defendants and the practices and procedures of Defendants' agents. . . .

In many affidavits, the affiants also swore, "I have reviewed the chain of title records as business records" regarding the relevant account. . . .

In fact, in numerous instances, affiants did not review the chain of assignment records prior to executing the affidavits.  In some cases, affiants reviewed only "chain of title" records that had been found online.  In fact, at least one of Defendants' Servicers instructed affiants that they did not need to review the chain of assignment records before executing affidavits that represented that the affiant had reviewed those records. . . .

In fact, affiants did not have access to deposit and sale agreements—the last link in the chain of assignment transferring loans into National Collegiate— until May 30, 2014. . . .

In many affidavits, the affiants asserted that they had personal knowledge that the loans were transferred, sold, and assigned to National Collegiate on dates certain. . . .

In fact, affiants lacked personal knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the subject loan. . . .

<u>In some instances, when affiants complained to management that they did not have personal knowledge of certain representations made in the affidavits, Defendants' Servicers instructed the affiants to continue signing the affidavits.  In some instances, affiants felt "bullied" by management and followed the instructions for fear of losing their jobs.</u>[38]

218.   Indeed, during a June 2017 deposition in an unrelated state-court action, a

---

[38]  *Id.* ¶¶ 27–39 (emphasis added).  The CFPB further found that these affidavits were improperly notarized, because, among other things, the notaries did not witness the affiants signing them.  *Id.* ¶¶ 43–51.

Transworld paralegal testified that the affiants review as many as <u>40 loan files</u> on a daily basis.[39]

### The Trusts Admit That Consumers Were Defrauded

219.    On March 9, 2018, National Collegiate's Trusts commenced the Delaware Action against Transworld and the Trusts' other "servicers" of allegedly defaulted, Trust-owned loans.

220.    The Delaware Action blames Transworld and its co-defendants for so "miserably" performing their duties that "rampant fraud[]" occurred in the state-court collection suits filed on behalf of the Trusts and against consumers like Plaintiffs.[40]

221.    Describing this fraud, the Delaware Action adopts and expounds the CFPB's investigative findings.  Specifically, the Delaware Action explains how state-court collection suits were prosecuted against consumers in which:

      a.    Standing to sue could not be proved, because chain-of-assignment documentation could not be found that established Trust ownership of the loan underlying the alleged debt being sued upon; and

      b.    False and misleading affidavits sworn out by Trust agents were submitted to state courts as proof of Trust entitlement to judgment against consumers.[41]

### Former Member of Transworld's Affiant Team Speaks Out

222.    James Cummins is a former employee of Transworld and/or NCO who was a member of the team of employees (the "Affiant Team"), who (1) sign the affidavits used to procure state-court judgments in favor of National Collegiate's Trusts and against consumers such as Plaintiffs, and (2) testify as the Trust's witness in state court in the rare instances in which an action

---

[39]  Bradley Luke Dep. Tr. 40:21–41:10, *Nat'l Collegiate Student Loan Trust 2006-3 v. Thurlow*, No. PORDC-CV-15-324 (Me. Super. Ct., Cumberland Cnty.) (June 16, 2017).

[40]  Del. Action Am. Compl. ¶¶ 4–5; *see supra* note 8.

[41]  *Id.* ¶¶ 5, 71–104.

against a consumer proceeds to trial.

223.    On January 6, 2020, Mr. Cummins swore out an affidavit to the CFPB (the "Cummins CFPB Affidavit") in which he detailed systemic misconduct in connection with the prosecution of state-court suits for the benefit of National Collegiate's Trusts and against consumers such as Plaintiffs.  Among other violations, Mr. Cummins stated that members of the Affiant Team were directed by management to:

       a.   Sign state-court affidavits containing language that they told management they did not understand, with management refusing to explain its meaning to them; and

       b.   Falsely testify during live appearances in state court that the amounts of money disbursed to consumers through student loans later allegedly owned by National Collegiate's Trusts, were greater than the amounts actually reflected in National Collegiate's records.[42]

### *Manager of Transworld's Affiant Team Admits Violations*

224.    On February 11 and 13 of 2020, Bradley Luke, the manager of Transworld's Affiant Team, testified as the corporate-defendant designee for Transworld/NCO and four of the National Collegiate Trusts, in an ongoing class action litigation (the "*Michelo/Bifulco Litigation*") that is "related" to this case for the purposes of Rule 13 of this District's Rules for the Division of Business Among District Judges.[43]

225.    In his testimony, Mr. Luke stated that, among other things, it was corporate policy for members of the Affiant Team <u>not</u> to review any chain-of-assignment documentation before

---

[42]  Cummins CFPB Aff. ¶¶ 5, 13–14.  (A copy of the Cummins CFPB Affidavit is available at: https://www.frankllp.com/files/cfpb_affidavit_-_jhc.pdf).

[43]  *Michelo et al. / Bifulco et al. v. Nat'l Collegiate Student Loan Trust 2007-2 et al. / Nat'l Collegiate Student Loan Trust 2004-2 et al.*, Nos. 18-cv-1781 (PGG) (BCM) & 18-cv-7692 (PGG) (BCM), (S.D.N.Y.) (the "*Michelo/Bifulco Litigation*").

signing state-court affidavits enabling National Collegiate Trusts to procure judgments against consumers such as those here.[44]

226.    Mr. Luke's statements prove that Defendants deceived state courts every time they applied for default judgments against consumers.   In so applying, Defendants represented expressly or by implication that they possessed, and had reviewed, proof that the Trust named as plaintiff truly owned the alleged debt being sued over.  In fact, they did not and had not.

227.    Mr. Luke's statements prove that the deficiencies highlighted by the CFPB's findings are systemic, rather than intermittent.  On information and belief, the CFPB's findings in its Consent Order are limited because the agency surveyed a sample of Defendants' records and work product in concluding that they (among other violations) generated false and misleading state-court affidavits "in numerous instances."  In contrast, Mr. Luke's February 2020 testimony shows that <u>all affidavits</u> filed by Defendants were false and misleading.

### *Transworld/NCO Admits It Cannot Understand PHEAA's Records*

228.    In a May 6, 2020 letter to the *Michelo/Bifulco Litigation* court, counsel for Transworld/NCO admitted that they do not possess a glossary defining the various transaction codes that were created by PHEAA and that appear in Transworld/NCO collection-account notes as to individual consumers allegedly indebted to National Collegiate's Trusts.[45]  Without such documents, Transworld/NCO employees are unable to translate PHEAA's codes. [46]

---

[44]  Bradley Luke Dep. Tr. 226:25–229:21, *Michelo/Bifulco Litig.*, (Feb. 13, 2017).  (A copy of this testimony is available at: https://www.frankllp.com/files/pages_226-229_from_tsi_30b6__bradleyluke_pdftran_ao.2.18.20.pdf).

[45]  Transworld/NCO's L.R. 37.2 Reply Ltr. to Ct., at 4, *Michelo/Bifulco Litig.*, (Dkt. No. 148 in Case No. 18-cv-1781; Dkt. No. 91 in Case No. 18-cv-7692) (May 6, 2020).

[46]  Pls.' L.R. 37.2 Ltr. to Ct., at 3, *Michelo/Bifulco Litig.*, (Dkt. No. 146 in Case No. 18-cv-1781; Dkt. No. 89 in Case No. 18-cv-7692) (May 1, 2020).

229.   On information and belief, without the ability to translate PHEAA's codes, it is not possible for National Collegiate's Trusts to understand the alleged events underlying a consumer's alleged indebtedness.

230.   Accordingly, members of Transworld/NCO's Affiant Team have perjured themselves when asserting in state-court affidavits—such as those used against Plaintiffs—that they (1) are "competent . . . to testify . . . through personal knowledge of the business records, including the electronic data, sent to [Transworld/]NCO that detail the education loan records" and (2) "have personal knowledge of the record management practices and procedures of Plaintiff [i.e., the relevant Trust] and the practices and procedures Plaintiff requires of its loan servicers and other agents."

231.   Transworld/NCO's admission of inability to understand PHEAA's records proves that the deficiencies highlighted by the CFPB's findings are systemic, rather than intermittent.   On information and belief, the CFPB's findings are limited in that the agency surveyed a sample of Defendants' records and work product in concluding that they (among other violations) generated false and misleading state-court affidavits "in numerous instances."   In contrast, the above admission shows that all affidavits such as those used against Plaintiffs were false and misleading.

## AS AND FOR A FIRST CAUSE OF ACTION

### (FAIR DEBT COLLECTION PRACTICES ACT)
### (Against Transworld, NCO, EGS, & Forster)

232.   Plaintiffs repeat and reallege each and every paragraph set forth above as though fully set forth herein.

233.   Each Plaintiff is a "consumer," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(3).

234.   Transworld is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

235.   NCO is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

236.   EGS is a "debt collector," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

237.   The FDCPA was enacted to stop "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors."  15 U.S.C. § 1692(a).

238.   The FDCPA identifies sixteen specific, nonexclusive prohibited debt collection practices, and generally prohibits a debt collector from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt."  Among the acts prohibited are: the false representation of "the character, amount, or legal status of any debt," 15 U.S.C. § 1692e(2)(A); "[t]he false representation or implication . . . that any communication is from an attorney[,]"15 U.S.C. § 1692e(3); "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken[,]" 15 U.S.C. § 1692e(5); "[c]ommunicating . . . credit information which is known or which should be known to be false[,]" 15 U.S.C. § 1692e(8); and "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt[,]" 15 U.S.C. § 1692e(10).

239.   The FDCPA also prohibits debt collectors from "us[ing] unfair or unconscionable means to collect or attempt to collect any debt."  15 U.S.C. § 1692f.

240.   Defendants violated the FDCPA by making false and misleading representations, using deceptive means, and engaging in unfair and abusive practices.  Defendants' violations include, but are not limited to, the following:

a.  filing lawsuits against Plaintiffs and the other members of the class, as described herein, without the intent or ability to prove the claims, if contested;

b.  filing lawsuits against Plaintiffs and the other members of the class, as described herein, for the sole purpose of procuring default judgments against consumers and/or extracting settlements from them;

c.  falsely representing that a Trust Defendant was "authorized to proceed" with the state-court actions filed against Plaintiffs and the other members of the class, as described herein;

d.  falsely representing that a Trust Defendant was the "original creditor" in the state-court actions filed against Plaintiffs and the other members of the class, as described herein;

e.  failing to identify, as required by law, the true originating entity for the loan being sued upon in the state-court actions filed against Plaintiffs and the other members of the class, as described herein;

f.  filing complaints against Plaintiffs and the other members of the class, as described herein, that were deceptive and misleading in that they were signed by an attorney but were not, in fact, meaningfully reviewed by an attorney;

g.  filing default judgment affidavits against Plaintiffs or other members of the class, as described herein, that were false or deceptive in that the affiant claimed personal knowledge of proof of indebtedness, when he or she in fact lacked such knowledge; and,

h.  communicating credit information adverse to any Plaintiff or other member of the class, as described herein—including in connection with state-court collection

actions against consumers—where that information is false or should be known

to be false.

241.    The acts and practices herein set forth were deceptive, misleading, and fraudulent.

Plaintiffs and the Class have been damaged as a result of these violations—including both

economic and noneconomic damages—and are entitled to relief as provided for by 15 U.S.C.

§ 1692k.

### AS AND FOR A SECOND CAUSE OF ACTION

**(N.Y. GEN. BUS. LAW § 349)**
**(Against All Defendants)**

242.    Plaintiffs repeat and reallege each and every paragraph set forth above as though

fully set forth herein.

243.    Plaintiffs are New York consumers entitled to the protection afforded under Article

22-A of the General Business Law ("GBL"), entitled "Consumer Protection from Deceptive Acts

and Practices."

244.    GBL § 349 provides that "[d]eceptive acts or practices in the conduct of any

business, trade or commerce or in the furnishing of any service in [New York] are hereby declared

unlawful."

245.    A GBL § 349 cause of action accrues when consumer-oriented conduct would be

deceptive and materially misleading to a reasonable consumer, and causes damages.

246.    Defendants' acts and omissions are directed at consumers and include, but are not

limited to:

   a.    filing lawsuits against Plaintiffs and the other members of the class, as described

         herein, without the intent or ability to prove the claims, if contested;

b.     filing lawsuits against Plaintiffs and the other members of the class, as described herein, for the sole purpose of procuring default judgments against consumers and/or extracting settlements from them;

c.     falsely representing that a Trust Defendant was "authorized to proceed" with the state-court actions filed against Plaintiffs and the other members of the class, as described herein;

d.     falsely representing that a Trust Defendant was the "original creditor" in the state-court actions filed against Plaintiffs and the other members of the class, as described herein;

e.     failing to identify, as required by law, the true originating entity for the loan being sued upon in the state-court actions filed against Plaintiffs and the other members of the class, as described herein;

f.     filing complaints against Plaintiffs and the other members of the class, as described herein, that were deceptive and misleading in that they were signed by an attorney but were not, in fact, meaningfully reviewed by an attorney;

g.     filing default judgment affidavits against any Plaintiff or other member of the class, as described herein, that were false or deceptive in that the affiant claimed personal knowledge of proof of indebtedness, when he or she in fact lacked such knowledge; and,

h.     communicating credit information adverse to Plaintiffs and the other members of the class, as described herein, herein—including in connection with state-court collection actions against consumers—where that information is false or known to be false.

247.    The acts and practices herein set forth were deceptive, misleading, and fraudulent. As a result of such practices, Plaintiffs and the other members of the Class were injured, suffered damages—including both economic and noneconomic damages—and are entitled to relief as provided for by GBL § 349(h).

## AS AND FOR A THIRD CAUSE OF ACTION

**(VIOLATIONS OF NEW YORK JUDICIARY LAW § 487)**
**(Against Forster)**

248.    Plaintiffs repeat and reallege each and every paragraph set forth above as though fully set forth herein.

249.    New York Judiciary Law § 487 provides as follows: "An attorney or counselor who . . . [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

250.    As set forth above, Forster violated New York Judiciary Law § 487 by engaging in a chronic, persistent pattern of conduct with the intent to deceive consumer-defendants and multiple New York courts.  Forster's violations include, but are not limited to:

a.    commencing actions against consumers on behalf of a Trust Defendant without sufficient factual basis, yet backed by an attorney's Rule 130 certifications falsely stating that, to the best of his or her knowledge, and after an inquiry "reasonable under the circumstances," the complaint and the contentions therein were not frivolous;

b.    filing complaints against consumers that falsely stated that a Trust Defendant was the "original creditor" with respect to the student loan at issue in the action;

    c.    filing complaints against consumers that falsely stated that a Trust Defendant was "authorized to proceed with th[e] action";

    d.    filing default judgment applications on behalf of a Trust Defendant without reasonable inquiry into the validity of the claims made against the consumer-defendant; and,

    e.    submitting default judgment affidavits on behalf of a Trust Defendant where the affiant falsely attested to personal knowledge of proof of indebtedness.

251.    As a result of Forster's deceitful and fraudulent conduct, Plaintiffs and the other members of the Class have been injured—including both economic and noneconomic damages. Plaintiffs and the Class are entitled to relief, as provided for by New York Judiciary Law § 487, in an amount to be determined at trial.

## TOLLING OF THE STATUTES OF LIMITATIONS

**Discovery Rule Tolling**

252.    Plaintiffs could not have discovered, through the exercise of reasonable diligence, within the time periods of the statutes of limitation for the FDCPA, GBL § 349, and New York Judiciary Law § 487, that Defendants had perpetrated their fraudulent scheme against them.

253.    Plaintiffs did not know, and could not have known, essential elements of their claims until the publication of the Cummins CFPB Affidavit on January 6, 2020, including that it has been Defendants' policy to file lawsuits without the intent or ability to prove the claims lawfully, if contested, but instead intended to deceive state courts through false and misleading live testimony.

254.    Plaintiffs did not know, and could not have known, essential elements of their claims until Bradley Luke's testimony in the *Michelo/Bifulco Litigation* on February 11 and 13,

2020, including that it has been Defendants' policy to submit affidavits where the affiant falsely attested to personal knowledge of proof of indebtedness, specifically, that the Trust Defendant named as plaintiff in the state court action truly owns the alleged debt being sued over.

255.    Plaintiffs did not know, and could not have known, essential elements of their claims until Transworld/NCO's letter to the court in the *Michelo/Bifulco Litigation* on May 6, 2020, including that it has been Defendants' policy to submit affidavits where the affiant falsely attested to personal knowledge of proof of indebtedness, specifically, the alleged events underlying the consumer's alleged indebtedness to the Trust Defendant named as plaintiff in the state court action.

256.    Therefore, the running of these statutes of limitations have been suspended with respect to any claims that Plaintiffs and the other members of the Class have as a result of Defendants' fraudulent scheme by virtue of the discovery rule doctrine.

**Fraudulent Concealment Tolling**

257.    Throughout the time period relevant to this action, Defendants affirmatively concealed from Plaintiffs and the other members of the Class the fraudulent scheme described herein.  As such, neither Plaintiffs nor the other members of the Class could have discovered, even upon reasonable exercise of diligence, that Defendants had secured default judgments against them through the fraudulent scheme described herein.

258.    Among other things, the false and misleading statements contained in the affidavits that were signed by Transworld and/or NCO employees, and that Forster and National Collegiate's other outside law firms filed on behalf of Trust Defendants in support of applications for default judgments against Plaintiffs and the other members of the Class, concealed the existence of Defendants' fraudulent scheme.

259.   Therefore, the running of the applicable statutes of limitations have been suspended until May 6, 2020, by virtue of the fraudulent concealment doctrine, with respect to any FDCPA, GBL § 349, and New York Judiciary Law § 487 claims that Plaintiffs and the other members of the Class have as a result of Defendants' fraudulent scheme.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment as follows:

i)   Declaring this Action to be a proper plaintiffs' class action, declaring Plaintiffs to be proper representatives of the Class, and declaring Plaintiffs' Counsel to be class counsel;

ii)   On the First Cause of Action, under the FDCPA, awarding Plaintiffs and the other members of the Class statutory and actual damages as provided by 15 U.S.C. § 1692k;

iii)   On the Second Cause of Action, under New York's Unfair and Deceptive Trade Practices Act, awarding such preliminary injunctive and ancillary relief as might be necessary to avert the likelihood of consumer injury during the pendency of this action; and entering a permanent injunction to prevent future violations of the GBL by Defendants;

iv)   On the Second Cause of Action, under New York's Unfair and Deceptive Trade Practices Act,, awarding statutory and actual damages as provided by GBL § 349(h);

v)   On the Third Cause of Action, under New York Judiciary Law § 487, awarding Plaintiffs and the other members of the Class monetary damages in an amount to be determined at trial, and treble damages, as provided by said statute;

vi)   Awarding Plaintiffs costs and expenses, including reasonable attorneys' fees and expenses; and

vii)   Granting such other and further relief as the Court might deem just and proper.

Dated:   New York, New York
         July 28, 2020

                                        Respectfully submitted,

                                        **FRANK LLP**

                                        By:   _/s/ Gregory A. Frank_
                                        Gregory A. Frank (GF0531)
                                        Marvin L. Frank (MF1436)
                                        Asher Hawkins (AH2333)
                                        370 Lexington Avenue, Suite 1706
                                        New York, New York 10017
                                        Tel: (212) 682-1853
                                        Fax: (212) 682-1892
                                        info@frankllp.com